IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Cr. No. 01-00160 (06) SOM |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER DENYING MOTIONS TO SUPPRESS |
| | ) | |
| JOE SAPPA (06), | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAY 1 7 2004

at \_\_ o'clock and 30 min. \_\_ M
WALTER A. Y. H. CHINN, CLERK

ORDER DENYING MOTIONS TO SUPPRESS

On April 5, 2004, Defendant Joe Sappa filed two motions to suppress. The first seeks suppression of all physical evidence seized during a search of his residence on April 23, 2001. Sappa argues that the search warrant underlying the search was not supported by probable cause. The second motion seeks suppression of statements made by Sappa as a result of the allegedly illegal search. Sappa argues that these statements were fruit of the poisonous tree. Sappa additionally argues that, because there was no probable cause supporting a warrant issued for his arrest, the statements made after his arrest should be suppressed. Because the court holds that the search and arrest warrants were supported by probable cause, both motions are denied.

I.  FINDINGS OF FACT.

By agreement of the parties, the only evidence before this court are the exhibits attached to the documents supporting

and opposing the motions. The court did not receive live evidence. Based on the submissions and argument of the parties, the court finds the following by a preponderance of the evidence.[1]

    1.  On April 22, 2001, United States Magistrate Judge Barry M. Kurren issued a search warrant for Sappa's residence, 91-1058 Kekuilani Loop, E508, Kapolei, Hawaii. This warrant authorized law enforcement officials to search for evidence of drug-related activities violating 21 U.S.C. §§ 841(a)(1) and 844(a). See Search Warrant. That same day, Magistrate Judge Kurren issued a warrant for Sappa's arrest. See Arrest Warrant.

    2.  The warrants were based on a twenty-four-page, single-spaced Affidavit of Michael D. Rothermund. At the time he applied for the warrants, Rothermund had been a Special Agent with the United States Drug Enforcement Administration ("DEA") for nearly five years and had conducted over 100 drug investigations and participated in executing more than 50 search warrants. See Affidavit of Michael D. Rothermund April 22, 2001.

---

[1] To the extent any finding of fact should more properly be designated a conclusion of law, it should be treated as a conclusion of law. Similarly, to the extent any conclusion of law should more properly be designated a finding of fact, it should be treated as a finding of fact. For ease of reference to particular findings and conclusions in later proceedings, if any, the findings and conclusions are presented in numbered paragraphs.

2

3. Rothermund's affidavit detailed large amounts of crystal methamphetamine being imported into Hawaii. The affidavit described the drug activity of a Cooperating Defendant ("CD-1"), a Cooperating Source ("CS-1"), James Michael Muns, Harold Otto Muns (aka "Michael Garcia"), and Falaniko Uti. Rothermund Aff. ¶¶ 7-8. When CD-1 was arrested on March 13, 1998, he had 13 pounds of crystal methamphetamine. Id. ¶ 7. CD-1 identified the Muns brothers of California as his crystal methamphetamine suppliers. Id. ¶ 7(b). CD-1 told law enforcement authorities that Uti might replace him as a distributor of crystal methamphetamine in Honolulu. Id.

4. CS-1 told law enforcement officials that CS-1 had purchased up to one to two pounds of crystal methamphetamine from CD-1 and that CS-1 worked for CD-1 as a crystal methamphetamine distributor. Id. ¶¶ 8(b) and (c). CS-1 also told law enforcement officials that CD-1 was getting the crystal methamphetamine from Jimmy and Harold, two brothers from Los Angeles, California. Id. ¶ 8(d). CS-1 also told authorities that Uti was supposed to take over the distribution of crystal methamphetamine in Honolulu. Id. ¶ 8(f).

5. Law enforcement officials were allowed to have pen registers placed on phone lines for Uti and the Muns brothers. These pen registers established phone calls between the phones. Id. ¶¶ 9 and 10.

6. Rothermund's affidavit detailed additional drug activity between another cooperating source ("CS-2") and Osovale Atapuai (aka "Jojo"). Id. ¶¶ 11-16. CS-2 told authorities that Atapuai had approached CS-2 about buying pound quantities of crystal methamphetamine. Id. ¶ 11. Rothermund had monitored a telephone call in which CS-2 had negotiated the purchase of one ounce of crystal methamphetamine for $2,400 from Atapuai. Id. ¶ 14. On November 14, 2000, CS-2 made a controlled purchase of two ounces of crystal methamphetamine from Atapuai. Id. ¶ 16.

7. On January 24, 2001, law enforcement officials saw Uti and Atapuai meeting briefly near an Air Liquide America Corporation truck in the Wal-Mart parking lot in Kunia, Hawaii. Id. ¶ 17.

8. Through a court-ordered wiretap, law enforcement officials heard Uti tell Atapuai in a phone conversation on April 19, 2001, that everything looked good and that Atapuai should get ready because Uti needed Atapuai as a bodyguard over the weekend. Id. ¶ 27(f). Rothermund believed that Uti was telling Atapuai that drugs were coming in over the weekend and that Atapuai should get ready to pick them up. Id.

9. Through the wiretap, law enforcement officials also heard Uti tell Sappa in a telephone conversation on April 20, 2001, to put the "tusi" or "kusi," a letter, package, or

4

envelope, in the bushes in front of Uti's house.[2] Rothermund believed that Uti was telling Sappa to put an envelope with money to purchase the incoming drugs in the bushes in front of Uti's house. Id. ¶ 27(g). Rothermund did not tell the court that, in the same conversation, Uti and Sappa discussed going to a funeral mass and that Sappa said he was going to Nick's funeral. See Exhibit 1 to the Government filing on May 5, 2004 (Government's Transcript with better identification of the speakers than provided by the defense); Exhibit C to the Motion (Sappa's Transcript).

    10. On April 20, 2001, law enforcement officials saw Uti meet an unknown Hispanic male in the Ala Moana Shopping Center parking lot. The Hispanic male got into Uti's automobile. When he got out of the automobile, the Hispanic male was carrying a shopping bag. He then got into a Dollar rental jeep and drove it to the Outrigger Ohana West Hotel in Waikiki. Rothermund Aff. ¶ 27(h). Agents later saw a parking ticket with number 434 written on it in the window of the parked jeep. Outrigger Ohana

---

[2] The Government's translation indicates that the word "tusi," which the Government defines as a letter or envelope, was used in the conversation. Sappa's translation of the same conversation, on the other hand, uses the word "kusi," which Sappa defines as an envelope or package. Whether the word was "tusi" or "kusi" is not relevant for purposes of this motion. The parties agree that Uti told Sappa to leave the letter, package, or envelope in the bushes in front of Uti's house if nobody was there to receive it.

West records indicated that parking ticket number 434 was registered to Fernando Gutierrez. Id.

11. Rothermund's affidavit discussed a number of phone calls that occurred on April 20, 2001, between Uti and Joseph Pajardo. Rothermund understood the two men to have been discussing the shipment of drugs. Rothermund further understood Pajardo to have told Uti that Pajardo had received the drugs. Id. ¶¶ 27(i)-(t).

12. On April 22, 2001, Gutierrez and Alfredo Sepulveda were arrested in the parking lot of the Outrigger Ohana West Hotel. Pursuant to that arrest, agents seized over $10,000 and several bags. A trained narcotics dog alerted to the money and to a black pack that Gutierrez was carrying. Id. ¶ 27(bb).

13. In applying for the warrant to search Sappa's residence, Rothermund, relying on his training and experience, said that "it is generally common practice for drug traffickers to store their drug inventory and drug-related paraphernalia . . . in their residences." Id. ¶ 3.

14. On April 23, 2001, the search warrant for Sappa's home and Sappa's arrest warrant were executed. Approximately 19 ounces of ice, drug paraphernalia, a handgun with a magazine, miscellaneous papers, and an airport security jacket were seized from Sappa's residence pursuant to the search warrant. See Return on Search Warrant. Sappa was arrested at that same time

pursuant to the arrest warrant issued by Magistrate Judge Kurren. Sappa was read his rights, waived them, and gave a statement.

III.    CONCLUSIONS OF LAW.

Motions to Suppress.

1. A judge's issuance of a warrant should be upheld as long as, "under the totality of the circumstances, the magistrate had a substantial basis for concluding that probable cause existed. In doubtful cases, preference should be given to the validity of the warrant." United States v. Schmidt, 947 F.2d 362, 371 (9th Cir. 1991) (internal quotation marks and citations omitted). A determination of probable cause is not reviewed de novo. Instead, it is accorded great deference and should not be reversed absent a finding of clear error. Id.

2. "All data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit under oath." United States v. Anderson, 453 F.2d 174, 175 (9th Cir. 1971). "Probable cause exists when the magistrate judge finds that, '[c]onsidering the totality of the circumstances,' there is 'a fair probability that contraband or evidence of a crime will be found.'" United States v. Reeves, 210 F.3d 1041, 1046 (9th Cir. 2000) (quoting United States v. Gil, 58 F.3d 1414, 1419 (9th Cir. 1995)).

3. Probable cause to believe that a suspect has committed a crime is not, by itself, adequate to obtain a search

7

warrant for a suspect's home. United States v. Ramos, 923 F.2d 1346, 1351 (9th Cir. 1991), rev'd on other grounds, United States v. Ruiz, 257 F.3d 1030 (9th Cir. 2001). The Ninth Circuit requires "a reasonable nexus between the activities supporting probable cause and the locations to be searched." United States v. Ocampo, 937 F.2d 485, 490 (9th Cir. 1991). A "reasonable nexus" does not require direct evidence that the items listed as the objects of the search are on the premises to be searched. Id. A judge issuing a search warrant must "only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit." United States v. Peacock, 761 F.2d 1313, 1315 (9th Cir. 1985) (citations omitted). The issuing judge may "draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense," United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986), and may "rely on the training and experience of police officers," United States v. Gil, 58 F.3d 1414, 1418 (9th Cir. 1995). The Ninth Circuit has recognized that evidence is likely to be found where drug dealers live. United States v. Pitts, 6 F.3d 1366, 1369 (9th Cir. 1993). This is consistent with Rothermund's Affidavit. See Rothermund's Aff. ¶ 3.

    4. Based on the Findings of Fact stated above, law enforcement officials certainly had probable cause to believe that Uti was involved in the distribution of crystal

methamphetamine in Hawaii. Law enforcement officials also had probable cause to believe that a shipment of crystal methamphetamine had come in from California just before the application for the search warrant was made. Based on a phone call between Uti and Sappa in which Uti told Sappa to leave a letter, package, or envelope in the bushes outside Uti's house, and based on his training and experience, Rothermund believed that Sappa was leaving money for Uti to pay for the drugs. Rothermund's affidavit and Ninth Circuit case precedent, Pitts, 6 F.3d at 1369, indicate that evidence of drug activity is likely to be found at a suspect's residence. A "reasonable nexus" existed between Sappa's suspected drug activity and the place the search warrant authorized law enforcement officials to search. Probable cause existed for the search warrant for Sappa's residence and the arrest warrant for Sappa.

    5. Even if the search warrant was invalid, however, the motions to suppress would be denied on the basis of the "good faith" exception announced in United States v. Leon, 468 U.S. 897 (1984). "If the executing officers act in good faith and in reasonable reliance upon a search warrant, evidence which is seized under a facially valid warrant which is later held invalid may be admissible." United States v. Michaelian, 803 F.2d 1042, 1046 (9th Cir. 1986). Here, there is no evidence that the

executing officers acted in anything other than good faith and reasonable reliance on the search warrant.

6. Because the search warrant was supported by probable cause, the statements made by Sappa are not the fruit of the poisonous tree. Under that doctrine, the exclusionary rule bars from trial materials obtained either during or as a direct result of an unlawful invasion. Accordingly, evidence seized during an unlawful search, whether direct or indirect, cannot constitute proof against the victim of the search. See Wong Sun v. United States, 371 U.S. 471, 484-85 (1963); United States v. Ramirez-Sandoval, 872 F.2d 1392, 1395 (9th Cir. 1989). Sappa gave a statement after he was arrested and waived his rights. He now argues that any statement he gave was fruit of the allegedly illegal search of his home. As neither the search of his home nor his arrest was unlawful, the exclusionary rule is inapplicable.

Franks Hearing.

7. A criminal defendant has a right under the Fourth and Fourteenth Amendments, after ex parte issuance of a warrant, to challenge the truthfulness of statements made in affidavits supporting the warrant. Franks v. Delaware, 438 U.S. 154, 171 (1978); United States v. Johns, 851 F.2d 1131, 1133 (9th Cir. 1988). The defendant is entitled to make that challenge at an evidentiary hearing, or a Franks hearing, only if that defendant

10

makes a suitable preliminary proffer of material falsity as to statements made in those affidavits:

> the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.

Franks v. Delaware, 438 U.S. 154, 171 (1978).

8. An affidavit submitted in support of an application for a warrant is presumed valid. Franks, 438 U.S. at 171. A defendant is entitled to an evidentiary hearing on the validity of the affidavit underlying a search warrant only if the defendant can make a substantial preliminary showing that (1) the affidavit contains intentional or reckless false statements or misleading omissions, and (2) the affidavit cannot support a finding of probable cause without the allegedly false

information. United States v. Reeves, 210 F.3d 1041, 1044 (9th Cir. 2000). Clear proof of deliberate or reckless omission is not required, but the defendant must make at least a "substantial showing" that the affiant intentionally or recklessly omitted facts required to prevent technically true statements in an affidavit from being misleading. United States v. Stanert, 762 F.2d 775, 781, as amended by 769 F.2d 1410 (9th Cir. 1985). Moreover, a defendant cannot make a "substantial showing" by arguing that the affidavit did not contain every fact known to the affiant. United States v. Ventresca, 380 U.S. 102, 108 (1965). Instead, affidavits must be examined in a commonsense and realistic fashion. Id.

        9.    Sappa has failed to make a "substantial showing" that Rothermund intentionally or recklessly omitted facts from his affidavit and thereby misled the court. See Stanert, 762 F.2d at 781. Sappa's entire argument is based on Rothermund's omission of the discussion of the funeral between Uti and Sappa. Sappa says that, had the Magistrate Judge been told of the funeral, the Magistrate Judge would have seen that Sappa's discussion might have related to an envelope with a funeral donation rather than drug money, or to a letter or package unrelated to drugs. Sappa is correct in arguing that there is a local custom of giving a decedent's family members money at a funeral. However, even had evidence of a funeral been presented

12

to the Magistrate Judge, there would still have been probable cause to believe that Sappa was involved in drug activity.

        10. An innocent explanation for the "tusi" or "kusi" (letter, package, or envelope) does not discount other evidence suggesting Sappa's involvement.[3] In particular, Rothermund had ample evidence that a drug transaction was about to occur in the very time frame of the purported funeral. Rothermund's training and experience reasonably led him to believe that Sappa was discussing drug money. Indeed, as Sappa said he himself was going to Nick's funeral, it made no sense for Rothermund to think Sappa was discussing Sappa's placing of a funeral donation outside of Uti's home. Presumably, Sappa would have taken any funeral donation to the funeral himself. Moreover, Rothermund knew that Uti had directed Sappa to put the "tusi" or "kusi" in the bushes if no one was home. This suggests that Uti did not want a passer-by to steal the item, and it was reasonable for Rothermund to think Uti was concerned that money might be stolen. No Franks hearing is required. See Reeves, 210 F.3d at 1044.

---

[3] Similarly, the discussion Uti and Sappa had about a barbeque does not negate the other evidence of drug activity. Because the discussion of the barbeque occurred after Uti and Sappa discussed the placement of the "tusi" or "kusi" in the bushes, Rothermund had no reason to believe that the conversation about the barbeque was in any way related to the discussion of the "tusi" or "kusi."

IV.  CONCLUSION.

For the foregoing reasons, the motions to suppress are denied.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, May 17, 2004.

/s/ Susan Oki Mollway
SUSAN OKI MOLLWAY
UNITED STATES DISTRICT JUDGE

United States of America v. Joe Sappa, Crim. No. 01-00160 SOM (06); ORDER DENYING MOTIONS TO SUPPRESS.